**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| COMPUTER SCIENCES CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JOHN PAUL MAGUIRE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

CASE NO.: 1:16-cv-00261-GBL-IDD

## <u>REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Computer Sciences Corporation ("CSC") alleges that Defendant John Maguire ("Maguire"): (1) disclosed CSC's confidential, proprietary, and/or trade secret information to Cognizant, and solicited Mass Mutual; (2) solicited Eddie Woods; and (3) fraudulently negotiated his severance agreement and release of his non-competition restrictions with CSC. CSC's Memorandum in Support of its Opposition to Defendant's Motion for Summary Judgment ("Opposition") confirms that, at the close of discovery, CSC's allegations continue to be based on nothing more than rank speculation that is disproven by the undisputed record.

CSC has **<u>no evidence</u>** that Maguire disclosed any confidential information concerning Mass Mutual, or that he solicited, diverted, or caused a reduction in Mass Mutual's patronage of CSC. The undisputed and uncontroverted evidence shows that Maguire had no involvement in the preparation or submission of Cognizant's bid for Mass Mutual BPO work, and that Maguire did not otherwise solicit Mass Mutual or disclose any CSC confidential information. CSC's evidence establishes only that Maguire, a senior Cognizant executive responsible for gathering and reporting Cognizant's revenue "pipeline" to Cognizant executive management, participated in internal "pipeline" calls with the Cognizant Insurance Group leadership (as he did with each of Cognizant's many business units) in which the Mass Mutual deal (among many others) was

discussed, and that he was kept apprised of the projected revenues, timing, and chances of winning each pipeline deal.  As conceded by CSC, that conduct does not violate any of his contractual restrictions, nor is there any reasonable inference that because Maguire engaged in entirely lawful activities related to Mass Mutual, he also engaged in unlawful activities.

CSC also presents **no evidence** that Maguire solicited Woods.  The undisputed record establishes that Woods initiated contact with Cognizant by clicking on the LinkedIn profile of a Cognizant recruiter (who had previously attempted to recruit Woods in 2013), and that his recruitment was handled by that recruiter and Mike Meyer, a Vice President of Cognizant's Engagement team.  Maguire had no involvement whatsoever.  CSC has **no** contrary evidence.

Desperate to distract from its evidentiary shortcomings as to Woods, CSC now also contends that Maguire solicited Bill Hutton, a former CSC employee who was **fired by CSC** and was never hired or even interviewed by Cognizant.  As set forth in more detail below, its attempt to add the Hutton claim is procedurally barred and, in any event, factually and legally meritless.

Lastly, CSC's allegation that Maguire "defrauded" it rests upon CSC's own idiosyncratic and undisclosed definition of the phrase "associated with" to mean that Maguire could engage in preliminary discussions with Cognizant (as he was expressly given permission to do), but could not cross some imaginary line into "detailed" discussions.  Its position simply makes no sense.

CSC concedes that Maguire was given permission to seek employment with Cognizant.  Once he secured a firm offer of employment, he promptly disclosed it to CSC and obtained CSC's written permission to accept the position before commencing employment.  Maguire had no contractual obligation to disclose every step of the recruitment process, provided that he fully disclosed his anticipated position and obtained CSC's written consent prior to commencing employment.  That is what he agreed to do and that is what he did.  Indisputably.

- 2 -

As CSC's General Counsel and corporate representative William Deckelman ("Deckelman") repeatedly admitted at deposition, this case was filed based on nothing more than CSC's speculation that discovery would turn up evidence to support its claims. (Deckelman Tr. 49:6-20; 101:12-102:11; 122:21-123:23; 155:8-156:8; 175:15-177:11;183:2-21-184:13.)[1] That speculation has now been disproven. Maguire is entitled to summary judgment on all Counts.

## I.   MAGUIRE'S REPLY TO CSC'S STATEMENT OF FACTS

The majority of Plaintiff's responses do not contradict the asserted facts, or are based on immaterial quibbles with wording. Brevity (and the Court's page limits) compels Maguire to limit his response to only some of the most misleading and material examples:

14, 16.   Plaintiff quibbles with the precise wording of Mike Lawrie's (CSC's CEO) assurance to Maguire that if Maguire wanted to work for a competitor they would "work it out." Regardless of the exact wording, the material, undisputed fact is that Lawrie expressly gave permission for Maguire to pursue employment opportunities with competitors. Further, Deckelman's testimony about what Lawrie told Maguire is hearsay. CSC has not explained how that evidence can be presented in an admissible form at trial given that CSC has expressly refused to produce Lawrie for deposition and has not listed him as a trial witness.[2] (Pl.'s Rule 26(a)(3)(A) Disclosures, Dkt. No. 78, at pp. 1-2.) Maguire's testimony is therefore undisputed.

22.   CSC contends that the undisputed assurances given by its CEO were not legally binding until put in writing. Even if true, that is immaterial to the undisputed fact that Maguire relied on those assurances in pursuing employment with Cognizant. (Maguire Tr. 93:13-17.)

23.   CSC attempts to muddy the record by stating that Maguire received a written offer of employment on November 5, 2014, which he should have disclosed. He did not. It was

---

[1] All cited deposition excerpts are attached as Ex. A
[2] Deckelman did not even speak to Lawrie to prepare for his 30(b)(6) deposition. (*Id.* at 10:3-5.)

an internal Cognizant document and there is no evidence that it was ever sent to Maguire or that he received it.  Moreover, it was a conditional, contingent offer of employment.  There was no obligation under any of Maguire's agreements to disclose such an offer.  CSC does not dispute that, once Maguire received a firm offer of employment, he promptly disclosed it to CSC.  CSC admits that it has no evidence that Maguire commenced employment or "associate[d] with" Cognizant prior to February, 2015 – long after securing CSC's written permission to do so. (Deckleman Tr. 49:6-20.)  Likewise, Maguire testified that he did not commence employment or associate with Cognizant until February, 2015. (Maguire Tr. 109:12-17; 154:17-19.)

30.     CSC's contention that Maguire began "his association with former CSC employees" prior to his start date makes no sense.  The "association" restriction is part of the non-compete provision, which applies to Maguire's dealings with Cognizant, not former CSC employees.  In any event, it is undisputed that Maguire did not engage in any employment-related or other competitive activities until after the parties had entered into the Second Letter Agreement waiving Maguire's non-compete restrictions as to Cognizant.

36.     CSC has presented no evidence that Maguire had any direct or indirect involvement in the recruitment, solicitation, or hiring of Eddie Woods.  Whether Maguire unlawfully solicited Hutton (he did not) is immaterial to whether Maguire solicited Woods.  The facts with respect to Eddie Woods are therefore undisputed.

38.     None of CSC's purported "facts" or evidence contradict the asserted fact that in or about June 2016 Cognizant received an unsolicited Request for Information from Mass Mutual concerning a comprehensive proposal for BPO, IT, and infrastructure services; that Cognizant submitted a response and was "down-selected"; and was asked to submit a binding proposal in October 2015.  Further, CSC makes the false assertion that there is no evidence to support the

unsolicited nature of the bid.  Ashish Gairola, the Cognizant Client Partner for Mass Mutual, testified that the bid was unsolicited and was a "surprise" to Gairola.  (Decl. of Gairola, Dkt. No. 39-3, at ¶ 5; Gairola Tr. 28:22-29:5; 44:11-18.)  CSC has no contravening evidence.

## II.    MAGUIRE'S RESPONSE TO CSC'S STATEMENT OF MATERIAL FACTS

For purposes of his Motion for Summary Judgment only, Maguire submits his responses to CSC's Statement of Material Facts.  Maguire does not concede that the facts as stated by CSC are accurate for any other purpose, including trial.  Many of them are inaccurate or materially incomplete, but Maguire's dispute with the stated fact is immaterial for purposes of this Motion.

51.    In Letter Agreement No. 1, Maguire agreed to the following terms, among others:

(i)     For six months after his Separation Date, he would not associate with eight specific companies, including Cognizant, without written permission from CSC's chief executive officer. (Ex. C to Compl., Dkt. No. 1-3, ¶ 9).

(ii)    The restriction concerning the Non-Solicitation of CSC employees (and those who had been employed by CSC within six months) and consultants would be shortened to 12 months. (*Id.*)

(iii)   The restriction on the Non Solicitation of CSC clients was eliminated with the exception of eight clients, including Mass Mutual, whose Non Solicitation restrictions remained in effect as written in the Employment Agreement for the shortened period of twelve months. (*Id.*).

(iii)   Maguire's obligation to protect and not misuse or disclose CSC's confidential information remained unchanged. (Answer, ¶ 12(iv)).

**RESPONSE**. **Disputed.**  Maguire "agreed" to those terms based upon Lawrie's prior assurances that if Maguire  wanted to work for any of the restricted companies then Maguire and Lawrie would "work it out," and that the restrictions were included only because Lawrie could not set a "precedent" of allowing Maguire to leave with no non-compete obligations. (Decl. of Maguire ¶¶ 7-10).  Maguire "took Mike [Lawrie] at his word."  (Maguire Tr. 93:17.)

53.    On November 5, 2014, Maguire received a letter with an offer of employment from Cognizant. (CSC Trial Exhibit 21). On November 14, 2014, Maguire communicated with Cognizant regarding potential employment. (*Answer*, ¶ 18).

**RESPONSE**. **Disputed.**  Maguire never received the November 5, 2014 offer letter – it

was an internal Cognizant document only.   CSC has presented no evidence that Maguire received it.  Further, the offer was a contingent, conditional, and non-final offer of employment. (CSC Trial Ex. 21; Maguire Tr. 141:12-142:16.)

54.    By December 4, 2014, Maguire had verbally accepted employment with Cognizant. (*Answer*, ¶ 19). At that time, Maguire was obligated by Letter Agreement No. 1 not to "associate" with Cognizant "without the written permission of CSC's CEO. (*Answer*, ¶ 19). Maguire had not obtained written permission to associate with Cognizant at the time that he accepted employment with Cognizant. (Deposition of John Maguire, p. 144).

**RESPONSE**.  **Disputed.**  Maguire did not commence employment or "associate" with Cognizant prior to February, 2015, long after he had obtained CSC's written permission to do so. (CSC Trial Ex. 24; Dkt. No. 37-1; Deckelman Tr. 49:6-20; Maguire Tr. 109:12-17; 154:17-19.)

55.    On January 16, 2015, Maguire signed Cognizant's offer letter. (*Answer*, ¶ 21). At that time, Maguire has not obtained written approval from CSC to associate with Cognizant. (Deposition of John Maguire, p. 144).

**RESPONSE**.  **Disputed.**  Maguire had CSC's written permission to join Cognizant no later than December 16.  (Ex. C to Reply Br.; *see also* Maguire Tr. 229:18-230:11.)  Further, Maguire did not commence employment or "associate" with Cognizant prior to February, 2015, long after he had entered into the Second Letter Agreement. *See* Response to No. 54, above.

59.    While he was employed at CSC, Maguire was the Client Relationship Executive for Mass Mutual. In this capacity, Maguire was responsible "to know at all times everything that's going on with the account." Maguire reported directly to CSC's chief executive officer regarding the Mass Mutual account, and the chief executive officer "expects that the CRE will have full knowledge of any offers." (Deposition of William Deckelman, pp. 167-68).

**RESPONSE**. **Disputed.**  Maguire assumed the Mass Mutual account late in his tenure at CSC and, as related to CSC's allegations in this case, Maguire does not recall ever speaking to anyone at Mass Mutual while at CSC (Maguire Tr. 34:19-24); the specifics or date of CSC's Rough Order of Magnitude ("ROM") bid to Mass Mutual (*id.* at 47:15-48:1); having any role in the presentation of CSC's ROM bid (*id.* at 60:6-21); any of the economic terms or pricing in CSC's ROM bid (*id.* at 60:22-61:6); working on or reviewing the RFI from Mass Mutual to CSC

in 2014 (*id.* at 55:12-16); the pricing or economic value of CSC's bid to Mass Mutual in 2014 (*id.* at 62:12-16); or any communications with anyone at CSC regarding Mass Mutual's decision not to accept CSC's bid in 2014 (*id.* at 62:22-63:15).   Moreover, CSC has not submitted any evidence that CSC's 2014 bid is the same as the 2015 proposal to which Cognizant responded.

60.     In December 2013, Mass Mutual issued a Request for Information from CSC to bid on BPO work. In response to this RFI, during 2014 CSC conducted prepared and submitted to Mass Mutual a proposal (the "Proposal"), including a Rough Order of Magnitude Pricing ("ROM") for a 10-year, $474 million project. (*Answer*, ¶ 32). Maguire was present on conference calls regarding CSC's Mass Mutual account, was aware of strategy and negotiations, and had access to the ROM pricing and Proposal details. (*Answer*, ¶ 33). As the Client Relationship Executive, Maguire "would have known the pricing, he would have known the scope, he would have known the term, he would have known everything about the proposal." (Deposition of William Deckelman, pp. 169).

**RESPONSE**. **Disputed**. *See* Response to No. 59, above.

61.     After Maguire joined Cognizant, no policies were put in place at Cognizant related to Maguire's obligations to CSC following his separation from CSC. (Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories, No. 13). No one ever told Gairola, Cognizant's client partner for Mass Mutual, that Maguire could not assist with any Mass Mutual proposals. (Deposition of Ashish Gairola, p. 69).

**RESPONSE**. **Disputed**.   Cognizant instructed Maguire not to disclose any CSC confidential information (including pricing, proposals, and IP) or information about CSC's clients, had its legal team review Maguire's contractual restrictions to ensure his Cognizant role had nothing to do with anything he was doing at CSC, and ensured that he was not assigned to any clients he had at CSC.   (Mehta Tr. 132:4-137:25.)   As to Mass Mutual, Gairola was not instructed that Maguire could not assist with any Mass Mutual proposals because Maguire was not involved in any Mass Mutual proposals.   (Maguire Tr. at 158:24-160:13; Gairola Tr. 19:6-12, 24:15-17, 30:16-31:13, 32:5-11, 37:18-39:5, 39:6-23; 42:22-43:22, 45:8-13, 48:23-49:19.)

63.     Ultimately, Cognizant was awarded the BPO work for Mass Mutual. The price proposed by Cognizant was less than the price proposed by CSC. CSC was told that the determining factor in the selection of Cognizant was "price." (Deckelman Tr. pp. 169-171).

**RESPONSE**. **Disputed.**   Maguire does not dispute that Cognizant won a BPO bid at

Mass Mutual. Neither Cognizant nor Maguire knows CSC's pricing proposal for that work. Further, CSC has not submitted any admissible evidence as to what it was told by Mass Mutual.

64.     When Maguire was a Senior Vice President for Global Sales at CSC, Eddie Woods was part of the sales team within Maguire's organization, and had direct dealings with Maguire. (Deposition of John Maguire, pp. 188-89).

**RESPONSE**. **Disputed.** Woods did not work directly under Maguire's direction at CSC, was not a direct report, and their "direct dealings" consisted of two occasions: one where Maguire was hosting an event and Woods was a winner and one where Maguire released Woods' geographic leader. (Maguire Tr. 188:19-189:18.)

68.     On February 5, 2015, Maguire wrote to Hutton and asked him to "give me a call next week." (CSC Trial Ex. 26). By February 13, 2015, Maguire had a discussion with Hutton in which he requested Hutton's resume, a summary of Hutton's compensation, and a summary of Hutton's "acumen." (CSC Trial Exhibit 27). After receiving this information from Hutton on February 13, 2015, Maguire forwarded the information to D K Sinha, Cognizant's President, Client Services, and with a recommendation that Mr. Hutton is a "big deal guy" and "might be worth a look - good guy - works hard." *Id*. Sinha asked Maguire to connect him with Hutton. *Id*.

**RESPONSE**. **Disputed**.   Maguire wrote to Hutton only after Hutton initiated the conversation by messaging Maguire on LinkedIn and informing Maguire that Hutton was no longer working for CSC. (Hutton Tr. 57:6-58:4; CSC Trial Ex. 26). Hutton also reached out to other former CSC employees at this time (Hutton Tr. 107:21-112:22).  Hutton never spoke to DK Sinha or anyone else at Cognizant after sending his resume to Maguire on February 13, 2015. (*Id.* at 113:12-20.)  Other than his friend Eddie Woods, Hutton did not talk to anyone at Cognizant after sending Maguire an email on April 1, 2015. (*Id.*)  Hutton never even spoke with Eddie Woods about a potential position at Cognizant. (*Id.* at 68:7-11.)  Hutton was never interviewed, offered a position, or employed by Cognizant.  (*Id.* at 114:2-9.)

## III.     STANDARD OF REVIEW

To defeat a properly-noticed motion for summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249 (1986).   "If the evidence is merely colorable, or is not significantly probative, summary judgment must be granted."  *Id.* at 249-50.  The non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  *Othentec Ltd. V. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (affirming summary judgment on trade secret claim that relied on "allegations and inferences instead of any sort of actual objective evidence"); *Trident Products & Services, LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F.Supp.2d 771, 781 (E.D. Va. 2012) (same).

## IV.   CSC HAS NO EVIDENCE TO SUPPORT ITS CLAIMS

Although spread across six Counts, CSC raises three fundamental allegations: (1) Maguire disclosed confidential, proprietary, and/or trade secret information about Mass Mutual and solicited Mass Mutual (Counts I-II, IV-VI); (2) Maguire solicited Eddie Woods (Count I); and (3) Maguire fraudulently negotiated his severance and the release of his non-competition restrictions (Count III).  CSC's claims are factually and legally meritless.

### A.   Maguire Did Not Solicit or Disclose Confidential, Proprietary, or Trade Secret Information Concerning Mass Mutual (Counts I-II, IV-VI)

CSC alleges that Maguire breached his contractual and fiduciary duties by using or disclosing CSC's confidential information concerning Mass Mutual, and soliciting Mass Mutual. CSC also alleges that these same facts give rise to claims for tortious interference with CSC's contractual relationship with Mass Mutual and trade secret misappropriation.

To start, it is critical to precisely define the restrictions at issue.  Maguire agreed "not to disclose, use, copy or duplicate or otherwise permit the use, disclosure, copying, or duplication of any Confidential Information . . . during or following his/her employment with CSC."  (Ex. A to Compl., Dkt. No. 1-1, at §III(1).)  He also agreed not to directly or indirectly "solicit, divert or cause a reduction in the business or patronage of any Client or Prospective Client."  (*Id.*)

CSC submits **no evidence** that Maguire breached any of these restrictions. The undisputed evidence is that in June, 2015, Mass Mutual – a long-time client of Cognizant[3] – sent an unsolicited Request for Information to Cognizant concerning a comprehensive proposal for Business Process Outsourcing Services, IT, and infrastructure services. (Decl. of Gairola ¶ 5; Gairola Tr. 28:22-29:5; 44:11-18.) The bid was prepared and submitted by Cognizant's Applications Infrastructure and BPO Sales Support teams, under the oversight of Ashish Gairola – Cognizant's relationship manager for Mass Mutual, who has serviced the account since 2009. (Decl. of Gairola ¶ 6; Gairola Tr. 48:7.) Maguire did not disclose the business opportunity to Cognizant, solicit Mass Mutual, prepare the proposal, provide input on the proposal, or disclose any CSC confidential information concerning Mass Mutual. (Decl. of Gairola, at ¶ 7; Maguire Decl., Dkt. No. 39-1, at ¶ 26; Gairola Tr. 19:6-12, 24:15-17, 30:16-31:13, 32:5-11, 37:18-39:5, 39:6-23; 42:22-43:22, 45:8-13, 48:23-49:19, 50:11-24; Maguire Tr. 159:2-160:13.)

Because it has **no** documents or testimony to support its claims, CSC clings to the fact that Maguire held monthly revenue "pipeline" calls with each of Cognizant's many business units to review the status of the top deals (160-200 deals on a monthly basis), including Mass Mutual. (Maguire Tr. 162:5-18; 166:4-11.) Maguire held these calls to determine, with respect to each of these myriad deals: (a) revenue projections; (b) timing; and (c) chances of success, so that he could make an accurate report of the Cognizant pipeline to Cognizant's executives. (*Id.* at 162:1-18.) In this capacity, Maguire was also provided with status updates and confidential Cognizant materials related to the Mass Mutual bid. (*See* CSC Trial Exs. 37-39.) But none of CSC's evidence establishes or even suggests that Maguire disclosed any confidential information, or that he solicited, diverted, or caused a reduction in Mass Mutual's patronage of

---

[3] Prior to its BPO bid in 2015, Cognizant had between 750 and 800 employees dedicated to Mass Mutual. (Decl. of Gairola ¶ 3; Gairola Tr. 21:17-21.)

CSC.  Indeed, CSC's General Counsel admitted that Maguire would not be in violation of his contractual restrictions by being kept informed of the status of the pipeline deals, including Mass Mutual.  (Deckelman Tr. 92:4-94:7.)  This is the exact extent of Maguire's involvement.

The evidence shows only that Maguire was a passive recipient of information.  In CSC's Exhibit 37, Ashish Gairola forwards a note from a Mass Mutual representative regarding the BPO proposal.  Gairola forwarded Maguire the e-mail because, during the revenue call, Gairola told Maguire he would send the latest updates, which included information regarding revenue, timing, and current status.  (Gairola Tr. 73:10-76:2.)  Maguire did not request the e-mail, did not respond, and did not provide any information about Mass Mutual either on the call or in response to the e-mail.  (*Id.*).  In CSC's Exhibit 38, Maguire asks for an update on the status of the Mass Mutual deal.  Gairola responds that it is "[s]till looking good," and that Gairola had a meeting with a Mass Mutual representative that morning.  Again, there is no disclosure or solicitation whatsoever by Maguire.  If the document has any probative value at all, the fact that Maguire needed a status update demonstrates that he was ***not*** actively involved.  Finally, in CSC's Exhibit 39, Gairola – who was unable to make the "pipeline" call on that date – sent Maguire a copy of the Mass Mutual proposal to "keep him informed on where things are with the deal."  (Gairola Tr. 80:10-81:2.)  Maguire did not request the proposal, and there is again no evidence whatsoever of any unlawful disclosure or solicitation by Maguire.  (*Id.* at 82:2-82:6.)  There is simply **<u>no evidence</u>** whatsoever that Maguire breached any contractual or fiduciary duty to CSC.

CSC's contention that these "facts" give rise to a trade secret misappropriation claim is, remarkably, even weaker than CSC's contractual claim.  CSC has not presented any evidence to establish: (1) the existence of a trade secret; (2) that Maguire misappropriated a trade secret; (3) that Maguire used or disclosed a trade secret, or (4) that CSC was damaged (or Cognizant was

unjustly enriched) as a result. Moreover, even if Maguire had access to CSC's trade secrets while at CSC, mere speculation that he then disclosed them while at Cognizant is insufficient to survive summary judgment. *Othentec Ltd.*, 526 F.3d at 140.

As to the tortious interference claims, for the reasons set forth above, CSC has wholly failed to establish that Maguire interfered with CSC's relationship with Mass Mutual. CSC also fails to address two additional dispositive arguments raised in Maguire's Opening Brief: (1) CSC's existing contractual relationship with Mass Mutual was not breached, precluding its claim for interference with an existing contract; and (2) CSC has failed to establish that it is "reasonably certain" that CSC would have secured the Mass Mutual business as against not only Cognizant, but "six or seven" other competitors, when CSC could not lock up the business opportunity when it was the ***only*** bidder. (Mot. Summ. J., Dkt. No. 39, at pp. 17-18.)

Put simply, CSC is asking the Court to conclude that, because Maguire participated in entirely lawful conduct related to Mass Mutual, it is reasonable to infer that he also engaged in unlawful conduct related to Mass Mutual. That is not a "reasonable inference"; it is rank speculation that is contradicted by the undisputed record. It is manifestly insufficient to defeat summary judgment. *Othentec*, 526 F.3d at 140; *Trident*, 859 F.Supp.2d at 781.

## B.    Maguire Did Not Unlawfully Recruit Eddie Woods (Count I)

CSC argues that the record raises "a genuine and serious issue of material fact regarding whether Maguire assisted in the solicitation or hiring of Eddie Woods." (Oppo. Br. at p. 20.) Nonsense. The undisputed record establishes precisely how Woods was recruited by Cognizant. In mid-October, Woods initiated contact with Cognizant by clicking on the LinkedIn profile of a Cognizant recruiter – Kendall Messner – who had previously attempted to recruit Woods in 2013 (long before Maguire joined Cognizant). (Decl. of Woods ¶ 2; Ex. A to Decl. of Woods.) Messner promptly contacted Woods. (Decl. of Woods ¶ 3.) Messner and Mike Meyer, a Vice

President of Cognizant's Strategic engagement team, then had a series of telephone calls and an in-person meeting with Woods in December, 2014, and January, 2015.  (*Id.* at ¶ 4.)  Woods was offered the position of Assistant Vice President – Strategic Engagement Team and commenced employment in April, 2015.  Maguire had nothing whatsoever to do with it.  (*Id.* at ¶¶ 2-6; Ex. A to Decl. of Woods; Decl. of Maguire ¶ 25.)  Woods does not report to Maguire or work directly or indirectly on Maguire's team at Cognizant.  (Maguire Decl. ¶ 25.)  In the face of this sworn testimony and supporting documents, CSC has not presented a shred of contrary evidence.

Instead, tacitly conceding it has no evidence, CSC asks the Court to disregard the undisputed record and find a genuine factual dispute because: (1) Woods initiated contact with Cognizant in the same month as Maguire; (2) Woods and Maguire both had discussions with Bill Hutton "during this time period"; (3) Maguire attempted to solicit other CSC employees (discussed below); and (4) Woods' "abruptly" departed from CSC.  (Oppo. Br. at p. 20.)

None of these "inferences" makes any sense.  First, Woods initiated contact with Cognizant, not the other way around.  It makes no sense to infer unlawful solicitation based on timing, where Maguire and Cognizant had nothing to do with the timing.  Likewise, that Woods previously sought employment with Cognizant twice before in no way suggests that Maguire was responsible for Woods seeking employment a third time.  Second, CSC does not explain the relevance of both Woods and Maguire having discussions with Hutton.  If CSC's unstated inference is that Hutton acted as a conduit, the inference makes no sense because Maguire's discussions with Hutton occurred in early February, long after Woods contacted Cognizant.  Third, Maguire's alleged attempts to solicit other *former* CSC employees that had been fired by CSC – after he was expressly requested by CSC's CFO to assist one – does not raise a reasonable inference that Maguire deliberately breached his agreement by soliciting a current CSC

employee (let alone while Maguire was still employed at CSC).   Fourth, Woods' recruitment and eventual hiring occurred over the course of six months – it was anything but "abrupt."   But in any event, there is no need to engage in guesswork because the undisputed evidence conclusively establishes how Woods was recruited and that Maguire was not involved.

### C.      The Hutton Allegations are Meritless (Count I)

Because it has no evidence to support its claims as to the solicitation of Woods, CSC attempts to evade summary judgment by alleging that Maguire unlawfully solicited Bill Hutton – a former CSC employee who was fired by CSC, and who Cognizant never interviewed or hired. [4]

### i.      CSC Cannot Raise the Hutton Allegations in this Case

As set forth in previous pleadings, Cognizant and CSC are engaged in protracted litigation in Texas state court over CSC's unlawful solicitation of certain Cognizant employees and the mass downloading and theft of Cognizant's confidential and trade secret information. On February 29, 2016, CSC filed a counterclaim against Cognizant in the Texas action, and a Third-Party Original Petition (Complaint) against Maguire, alleging a variety of torts based upon the alleged solicitation of Hutton.   Cognizant and Maguire moved to dismiss CSC's claims, arguing that they should be decided in Virginia under the exclusive venue provision in Maguire's contract.   In order to evade dismissal, CSC filed a non-suit against Maguire, thus preserving its claims in Texas against Cognizant while nullifying the effect of the exclusive venue provision.

With full knowledge of its claims as to Hutton, and despite filing a First Amended Complaint in this case, CSC chose *not* to re-plead the Hutton allegations against Maguire in this action.   This was not an oversight.   It was a strategic decision to preserve its claims against Cognizant in Texas by omitting those allegations from this case, thereby depriving Cognizant of

---

[4] CSC's Opposition frames this as a breach of contractual and fiduciary duties.   However, it was not pled as a breach of fiduciary duty, and CSC cites no case law holding that a former employee owes a continuing fiduciary duty not to solicit his former colleagues.

any argument that the Texas counterclaims should be transferred here.  CSC's gamesmanship worked.  But having made that decision, CSC is bound by its pleadings and cannot now rely on the unpled Hutton allegations to evade summary judgment.  *See, e.g., McKelvy v. Capital One Servs., LLC*, 2010 WL 3418228, at *5 n. 7 (E.D. Va. Aug. 20, 2010) (a plaintiff is bound by the allegations of his complaint and cannot raise new claims in opposition to summary judgment).

ii.    **The Hutton Allegations Fail on the Merits**

Even if this Court were inclined to consider the merits of CSC's allegations as to Hutton, its claim fails for a number of reasons.  First, Maguire's non-solicitation provision is facially overbroad and unenforceable under Virginia law.  Maguire's Non-Competition Agreement, as amended and modified by the Letter Agreements, and his stock option agreements, purports to restrict Maguire from "hir[ing], attempt[ing] to hire or assist[ing] any other person or entity in hiring or attempting to hire any current employee of CSC *or any person who was a CSC employee within the 6-month period preceding such hiring or attempted hiring.*"  (Ex. A to Compl., Dkt. No. 1-1, at § III(2)(a) (emphasis added).)  A non-solicitation provision that applies to all current or former employees, throughout the world, regardless of whether the two employees had even met, and regardless of the position for which the employee is solicited, is facially overbroad and unenforceable under Virginia law. *Strategic Ent. Solutions, Inc. v. Ikuma*, 77 Va. Cir. 179, 2008 WL 8201356, at *4 (Va. Ct. App. Oct. 7, 2008) (non-solicitation clause covering all current or former employees is facially overbroad and unenforceable); *Patient First Richmond Med. Group, LLC v. Blanco*, 2011 WL 9175245 (Va. Cir. Ct. Feb. 15, 2011) (same).

Second, CSC has failed to establish a material breach of the contract.  Paul Saleh, CSC's CFO, expressly requested that Maguire assist in obtaining employment for another former CSC employee, Vince Ostrosky.  (Maguire Tr. at 216:25-218:22.)  In that same timeframe, Maguire

also attempted to help Hutton, another employee who had been fired by CSC. (*Id.* at 197:11-198:24; 214:19-215:11.) Upon learning that, despite Saleh's request, CSC objected to that contact, Maguire ceased contact with Hutton and Hutton was never interviewed or hired by Cognizant. (Hutton Tr. at 113:12-114:9.) Even if Maguire's initial contact with Hutton were a technical breach, it was not "material" in that: (1) it did not deprive CSC of Hutton's services; (2) it did not permit Maguire (or Cognizant) to obtain the benefit of Hutton's services; (3) CSC suffered no damages; (4) Maguire was acting in good-faith based upon his understanding that CSC did not object (but rather elicited his help) in providing assistance to former CSC employees that CSC had fired; and (5) the breach was promptly cured. *See, e.g.*, *RW Power Partners, L.P. v. Virginia Elec. & Power Co.*, 899 F. Supp. 1490, 1496-97 (E.D. Va. 1995) (granting declaratory judgment that breach was not material and laying out relevant factors).

Third, CSC has failed to establish that it suffered any damages, or that Maguire (or Cognizant) was unjustly enriched, by Maguire's alleged solicitation of a former CSC employee who had been fired by CSC, and was never interviewed or hired by Cognizant. Indeed, CSC does not even try. (Oppo. Br. at p. 23.) Instead, CSC relies solely on the "specific liquidated damages provisions, including recoupment and forfeiture," in the stock option agreements. (*Id.*)

The problem for CSC is that the "liquidated damages" provisions in the stock option awards are an unenforceable penalty under Virginia law. The stock option agreements purport to allow CSC to recoup the realized gains on any stock option exercise if Maguire breaches the Agreement. According to CSC, that amounts to $513,809 in the context of this case.[5] "As the Supreme Court of Virginia has explained, parties to a contract may agree in advance about the remedy resulting from a breach, including damages, but only when (i) the actual damages

---

[5] Maguire disputes that CSC's calculation is accurate, but the precise amount is immaterial for purposes of this Motion.

contemplated at the time of the agreement are uncertain and difficult to determine with exactness *and* (ii) the amount fixed is not disproportionate to the probable loss." *Job v. Simply Wireless, Inc.*, 160 F. Supp. 3d 891, 897 (E.D. Va. 2015).   "If these conditions are not met, then the provision will be construed as an unenforceable penalty." *Id.*  Here, neither condition is met.

As applied to a former employee who CSC fired, the "actual damages contemplated" are not "uncertain and difficult to determine" – they are zero.  CSC cannot articulate any plausible explanation of how it anticipates being damaged, let alone by hundreds of thousands of dollars, by a competitor hiring an employee CSC no longer wanted.  Likewise, the amount – in excess of $500,000 – is grossly disproportionate to the "probable loss"; indeed, CSC tacitly concedes that it cannot establish *any* loss.  The fluid amount of the penalty – based entirely on the external factor of CSC's public share price – also makes clear that the provision was not even intended to approximate the anticipated loss.  The liquidated damages provision is simply unenforceable.

### iii.   CSC Cannot State a Claim as to "Other Employees"

Finally, in a throwaway argument, CSC appears to argue that Maguire breached his contractual provisions by asking John Chiavelli and Chris O'Leary to "call him."   The undisputed evidence establishes that Maguire did not solicit them to join Cognizant and, in any event, neither of them were hired by Cognizant.   CSC cannot establish damages or unjust enrichment for the same reasons discussed above.  (Maguire Tr. 209:7-212:20.)

### D.   Maguire Did Not Defraud CSC (Count III)

CSC alleges that Maguire negotiated his severance agreement and the release from his non-compete restrictions "fraudulently" and in "bad faith."   CSC's fraud claim rests on its idiosyncratic and undisclosed definition of the phrase "associate with" to mean that an employee is permitted to actively seek and engage in discussions for prospective employment, but must refrain from crossing some imaginary and undefined line into "detailed" discussions.

(Deckelman Tr. 111:15-25.)   CSC also contends that Maguire "failed to disclose that he would be involved in Cognizant's solicitations to Mass Mutual." (Oppo. Br. at p. 24.)   As described above, Maguire did no such thing, either before or during his employment with Cognizant.

In Section III(3) of his Non-Competition Agreement, Maguire agreed that, for a period of 12 months after his separation of employment, he would not, "without the express, prior written consent of CSC's General Counsel, either directly or indirectly, as an employee, agent, contractor, consultant, partner, member, officer, director or stockholder . . . participate in any activity as, or for, a Competitor of CSC which is the same or similar to the activities in which [Maguire] was involved at CSC." (Ex. A to Compl., Dkt. No. 1-1.)   The parties agree that this restriction does not prevent Maguire from talking to any of CSC's competitors about prospective employment, including prior to Maguire's separation of employment (Deckelman Tr. 106:10-15; 107:5-9; 110:3-22.)   Likewise, CSC admits that, even after signing Letter Agreement No. 1, Maguire was free to engage in those same activities. (*Id.* at 110:3-111:14.)

On November 13, 2014, Maguire executed the First Letter Agreement.   The First Letter Agreement again provided that Maguire "will not, directly or indirectly, whether as an individual proprietor, partner, stockholder, officer, employee, . . . or in any other capacity, associate with" certain competitors, including Cognizant. (CSC Trial Ex. 22 § 9.)   In light of the surrounding context, and that he already had permission from CSC's CEO to pursue employment with the listed competitors, Maguire understood this term to mean that he would not "work" in any capacity for those entities. (Maguire Tr. 109:12-110:17.)   CSC's General Counsel similarly testified that the phrase "associate with" means "some type of relationship." (Deckelman Tr. 86:8-16.)   Once Maguire obtained a firm offer of employment from Cognizant, he promptly disclosed it to CSC, negotiated the terms of his release, obtained CSC's written permission to

accept the position, and did not engage in any employment or other competitive activities until after obtaining CSC's written release.  (Maguire Tr. 77:21-79:4.)

CSC contends, however, that Maguire defrauded it because, in its "made-for-litigation" hindsight opinion, CSC would have handled the negotiations differently if Maguire had disclosed that Cognizant had agreed to financial terms with Maguire before Maguire entered into Letter Agreement No. 1, and because Maguire verbally "accepted" the offer of employment on December 4, 2014, prior to obtaining CSC's written permission to do so.  (*See* Oppo. Br. p. 25-26.)  CSC's self-serving position has no factual or legal basis, and defies common sense.

Maguire had already obtained Lawrie's express permission to pursue employment with a competitor.[6]  The November 5th letter cited by CSC was an internal Cognizant document – there is no evidence it was ever sent to or received by Maguire.  Moreover, Maguire had no obligation to disclose every step of his recruitment process, provided that Maguire fully disclosed his anticipated employment and obtained CSC's written permission before commencing employment or otherwise engaging in any competitive activities.  That is precisely what he did. Indeed, when pressed, CSC's General Counsel admitted that it has no evidence that Maguire was employed or "associated with" Cognizant before February, 2015 – long after the parties had entered into Letter Agreement No. 2 expressly waiving Maguire's non-compete restrictions as to Cognizant.  (Deckelman Tr. 49:6-20.)  There has certainly been no showing of intentional fraud or misrepresentation by Maguire.  *E.g.*, *Shuler v. Partner JD*, 2015 WL 5020898, at *4 (E.D. Va. Aug. 20, 2015) (fraud claim requires an intentional false representation of material fact).

---

[6] CSC cannot exclude the statements of its own CEO under the parol evidence rule because: (1) Lawrie's assurances do not vary or contradict the terms of Maguire's written contract, which says nothing about whether he can interview or pursue employment with a competitor; and (2) that CSC's CEO knew of and gave Maguire permission to pursue employment with a competitor is directly relevant to whether CSC was misled or defrauded by Maguire.

Moreover, CSC concedes that by December 13, 2014 – more than a month *before* CSC signed Letter Agreement No. 2 – CSC knew Maguire would be joining Cognizant, and thus it could not possibly have detrimentally relied on any alleged prior misrepresentation. *See id*.; (Deckelman Tr. 143:2-5.) Likewise, by expressly permitting Maguire to join Cognizant with full knowledge that Maguire had been engaged in employment discussions with Cognizant before obtaining CSC's "written permission," CSC expressly waived any claim. *See Congdon v. Com*, 705 S.E.2d 526, 529-30 (Va. Ct. Appl 2011) (a party may waive any legal right by contract).

CSC also contends that Maguire defrauded it by "failing to disclose that he would be involved in Cognizant's solicitations to Mass Mutual." (Oppo. Br. p. 24.) This argument has no factual basis. As set forth above, there is zero evidence whatsoever that Maguire disclosed any CSC confidential information or solicited Mass Mutual. And there is certainly no evidence that, at the time Maguire was being recruited, he knew he would be involved in soliciting Mass Mutual for BPO work but concealed that information from CSC – particularly considering that Cognizant did not even receive Mass Mutual's unsolicited RFI until months later, in June, 2015.

Finally, CSC has failed to establish damages. Maguire fully disclosed his anticipated employment and position at Cognizant. Armed with that knowledge, CSC expressly waived the restriction precluding Maguire from joining Cognizant in exchange for a payment from Maguire of $56,481. Indeed, even CSC's counterfactual hypothetical that it would have handled the negotiations differently knowing Maguire intended to join Cognizant does not hold up to scrutiny, as CSC permitted Maguire to retain his severance for the full period preceding his start date, including the two-month period after CSC learned that Maguire intended to join Cognizant.

## V.    CONCLUSION

For the reasons set forth above, Maguire is entitled to summary judgment on all Counts.

Dated:  October 6, 2016                    Respectfully submitted,


                                           /s/ *Benjamin S. Boyd*
                                           Benjamin S. Boyd, VSB No. 28427
                                           Julie A. Gryce, VSB No. 80422
                                           DLA PIPER LLP (US)
                                           500 8th Street NW
                                           Washington, DC 20004
                                           P: 202.799.4502
                                           F: 202.799.5502
                                           benjamin.boyd@dlapiper.com
                                           julie.gryce@dlapiper.com

                                           *Attorneys for Defendant*
                                           *John Paul Maguire*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified below via transmission of Notice of Electronic Filing generated by CM/ECF.

J. David Folds
Baker Donelson Bearman Caldwell & Berkowitz PC
901 K Street, NW
Suite 900
Washington, DC 20001
Email:  dfolds@bakerdonelson.com

/s/ Benjamin S. Boyd
Benjamin S. Boyd